IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | Case No. 4:24cr |
| | § | Judge |
| MOUZON BASS, III (1) | § | |
| a/k/a "Muzzy" | § | |
| (2) | § | |
| (3) | § | |

**INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

**General Allegations**

At all times material to the facts set forth in this Indictment:

**The Defendants, Their Entities, and Their Bank Accounts**

1.     Defendant **Mouzon "Muzzy" Bass, III,** was an individual residing in Highland Park, Texas.

2.     Defendant ▮▮▮▮▮▮ was an individual residing in Allen, Texas.

3.     Defendant ▮▮▮▮▮▮▮ was an individual residing in Colorado, Oklahoma, and California, and was a licensed physician in approximately fifteen states including Colorado, Oklahoma, and Arkansas.

4.     Vivature, Inc. ("Vivature") was a company that purported to provide medical billing services to a variety of entities, including university health centers, athletic departments, counseling centers, high schools, and international resorts.  Vivature was a

Indictment
Page 1 of 22

subsidiary of its parent company, Orchestrate HR, Inc.  **Bass** was the majority owner and

Chief Executive Officer of Vivature, and ▮▮▮▮ was the Executive Vice President of the

company.

     5.     Varsity Health, Inc. was a business entity registered in Oklahoma. ▮▮ was

a registered agent for the company.

     6.     **Bass**, ▮▮▮▮ and ▮▮ opened and controlled numerous bank accounts at

Veritex Bank, Titan Bank, and Bank of America, among other financial institutions.

Specifically, the defendants controlled the following accounts, among others:

- On or about June 1, 2012, **Bass** opened an account at Veritex Bank ending in 1200 ("Veritex 1200 account"), in the name of Vivature, listing **Bass** as an authorized signer.

- On or about June 4, 2012, **Bass** opened an account at Veritex Bank ending in 1277 ("Veritex 1277 account"), in the name of Vivature, listing **Bass** as an authorized signer.

- On or about January 22, 2010, **Bass** opened an account at Veritex Bank ending in 1278 ("Veritex 1278 account"), in the name of Orchestrate HR, Inc DBA Employers Direct Health, listing **Bass** as an authorized signer.

- On or about August 30, 2017, ▮▮▮ opened an account at Veritex Bank ending in 9062 ("Veritex 9062 account"), in the name of ▮▮▮ ▮▮▮▮▮▮▮▮▮, listing ▮▮▮ as an authorized signer.

- On or about June 6, 1994, ▮▮▮▮ opened an account at Bank of America (previously NationsBank) ending in 9903 ("BOA 9903 account"), listing ▮▮▮▮ as an authorized signer.

Beginning in or around 2019, Vivature's banking relationship with Veritex Bank was

centered at a bank location in the Eastern District of Texas, and all Automated Clearing

House (ACH) transfers and the majority of physical check deposits associated with

Vivature, **Bass**, or ████ were processed through Veritex Bank locations in the Eastern District of Texas.

7.      With respect to healthcare reimbursements, a "servicing provider" is the individual or entity who performed the healthcare service.  A "place of service" is a healthcare facility where the healthcare service was delivered.

8.      A National Provider Identifier ("NPI") is a unique 10-digit numeric identifier for covered healthcare providers, created to help send health information electronically safely and efficiently.   Covered healthcare providers, health plans, and healthcare clearinghouses must use NPIs in their administrative and financial transactions.   A healthcare provider's NPI does not change, even if their name, address, taxonomy, or other information changes.

## COUNT ONE

Violation: 18 U.S.C. § 1349, 1343
(Conspiracy to Commit Wire Fraud)

9.      The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

10.      From in or around April 2014 and continuing up through and including the date of this Indictment, in the Eastern District of Texas and elsewhere, the defendants, **Mouzon Bass, III**, ████████ and ████ ████ along with others both known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, wire fraud, that is to transmit and cause to be

transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property from private health insurance carriers by means of false and fraudulent material pretenses, representations, and promises.

### Overview of the Athletic Billing Scheme

11.     **Bass,** ███████ ████ and others executed a multimillion-dollar scheme to defraud private insurance companies.  **Bass** and ███████ used their company, Vivature, to submit false claims to private insurance carriers representing that physicians, like co-conspirator ███████ were providing medical services for injured student-athletes at universities across the country.  In reality, ███████ and other physicians did not see or treat these student-athletes, and in many instances, were physically hundreds of miles away from where the student-athletes were receiving treatment.  The services were actually performed by athletic trainers employed by the educational institutions' athletic departments—who, most times, were specifically excluded from insurance companies' reimbursement policies.  At the direction of **Bass** and ███████ Vivature submitted thousands of false claims to the insurance companies, named ███████ and other physicians as the servicing providers, and used their NPI numbers on the claims paperwork.  In exchange for allowing the fraudulent use of their NPI and credentials, Vivature made regular payments to ███████ and other physicians.  In addition, using the fraud proceeds, the defendants transferred the funds to various accounts, paid each other and co-conspirators salaries and commissions, and purchased high-dollar luxury items and multi-million-dollar real estate.  During the

scheme, Vivature submitted thousands of fraudulent claims to private insurance carriers, and **Bass**, ▆▆▆▆ and ▆▆▆ collected over $50 million in paid reimbursements.

### Purpose of the Conspiracy

12.    It was the general purpose of the conspiracy for **Bass**, ▆▆▆▆ ▆▆▆ and their co-conspirators to unlawfully and unjustly enrich themselves by obtaining healthcare reimbursements from private insurance companies through materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Conspiracy

13.    The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

- a.  The defendants arranged with representatives of educational institutions, including those in the Eastern District of Texas, to provide medical billing services for injured student-athletes;

- b.  The defendants and their co-conspirators communicated with each other via phone, in-person meetings, and emails;

- c.  The defendants and their co-conspirators opened businesses to conduct the fraud and opened bank accounts to receive, deposit, and transfer fraudulently obtained reimbursements;

- d.  The defendants and their co-conspirators submitted materially false and fraudulent claims and paperwork to private health insurance providers, including by falsely stating that ▆▆▆ and other physicians were the servicing providers for treatments actually provided by athletic trainers;

- e.  The defendants, in some instances, used physicians' NPI numbers and credentials on claims paperwork without their knowledge or consent. In other instances, the defendants paid certain physicians, like ▆▆▆ for the fraudulent use of their NPI number and credentials;

f. The defendants, using the fraudulently obtained proceeds, paid each other and co-conspirators salaries and commissions and purchased high-dollar luxury items, including multimillion-dollar real estate;

g. The defendants' caused financial transactions that were processed by Veritex Bank at locations in the Eastern District of Texas; and

h. The defendants caused transmissions that affected interstate and foreign commerce by using the financial banking system and causing the claims to be submitted to insurance companies across the country.

### Private Insurance Reimbursements

14.     Vivature employees, at the direction of **Bass** and ▮▮▮▮ submitted claims for treatment provided to injured student-athletes to these student-athletes' private health insurance carriers, such as Blue Cross Blue Shield, Kaiser Permanente, Cigna and Humana. Generally, each of these insurance companies reimbursed claims for healthcare services rendered by a qualified "servicing provider," which included physicians, hospitals, and other specified healthcare professionals.   However, according to their policies, most insurance carriers did not cover services provided by athletic trainers or university athletic departments, nor did they cover telemedicine supervision or treatment of injured student-athletes.

### Acts in Furtherance of the Conspiracy

#### *The Defendants' Pitch and Contracts with the Institutions*

15.     **Bass** and ▮▮▮▮ marketed Vivature's medical billing services to athletic departments at high schools and universities across the country. **Bass,** ▮▮▮▮ and other sales representatives invited these organizations to use Vivature to help generate revenue

by billing students' private health insurance carriers, such as Blue Cross Blue Shield ("BCBS") of Texas, BCBS of Arkansas, Kaiser Permanente, Cigna, and Humana, for treatment services provided to students.  Specifically, Vivature represented that when a student-athlete was injured in relation to a university sport, the institution's athletic trainer could record the work they performed for the injury in the athletic training room within Vivature's electronic medical record software.  Vivature would then use the information in its software, along with student demographics, insurance data, and other notes related to the injury, for claims submission to the insurance company.  Vivature would then electronically submit the claim to the insurance company for billing.  Insurance companies would then, after evaluating the submission, pay the claim directly to Vivature, for the benefit of the institution.  Vivature would then share the revenue with institution per the parties' contract.

16.    Over the course of the scheme, Vivature representatives executed contracts with multiple institutions, including institutions in the Eastern District of Texas.  For instance:

- On or about December 9, 2014, ████ on behalf of Vivature, entered into an agreement with LeTourneau University ("LETU") to provide web-based medical billing services, insurance verification, and credentialing services.  According to the contract, Vivature agreed to pay LETU 65% of the total insurance collections received for claims billed for LETU student-athletes.  LETU is located in Longview, Texas, in the Eastern District of Texas.

- On or about July 9, 2014, ████ on behalf of Vivature, entered into an agreement with Auburn University "("Auburn") to provide web-based medical billing services, insurance verification, and credentialing services.  According to the contract, Vivature agreed to pay Auburn 65% of the total insurance collections received for

claims billed for Auburn student-athletes.  Auburn is located in Auburn, Alabama.

- On December 3, 2018, ▮▮▮▮▮ on behalf of Vivature, signed a contract with Arkansas Tech University ("ATU") to provide web-based medical billing services, insurance verification, and credentialing services.  According to the contract, Vivature agreed to pay ATU 65% of the total insurance collections received for claims billed for ATU student-athletes.  ATU is located in Russellville, Arkansas.

### *The Use of Physicians' Credentials*

17.     In some instances, **Bass,** ▮▮▮▮▮ and representatives of Vivature used physicians' names, NPIs, and credentials on claims paperwork submitted to insurance companies without the physicians' consent or knowledge.  Specifically, when appealing certain claims with private insurance companies, Vivature sent "attestation" statements to the insurance companies, purportedly authorized and signed by a physician who was listed as the servicing provider.  In reality, when interviewed by law enforcement, these physicians confirmed that they had no knowledge of these statements, never signed these statements, and never authorized the submissions of these statements to insurance companies during the claims appeal process.

18.     In other instances, **Bass,** ▮▮▮▮▮ and representatives of Vivature agreed to pay certain physicians for the fraudulent use of the physicians' NPI and credentials and executed written agreements with these physicians.  For example, in or around August 2017, **Bass,** on behalf of Vivature, entered into an agreement with ▮▮▮ under which ▮▮▮ was to "provide medical oversight of athletic trainers and related personnel who provide treatment on or for the benefit of Vivature Clients."  In exchange for **Scott**'s services, **Bass** and Vivature agreed to pay ▮▮▮ $10,000 per month.

*Examples of Fraudulent Insurance Submissions*

19.     Between in or around August 2020 and May 2023, Vivature submitted thousands of claims to BCBS Arkansas on behalf of Arkansas Tech University ("ATU") for treatment provided to injured student-athletes.

20.     In a 2023 interview with law enforcement agents, ATU's Head Athletic Trainer with initials "B.W" confirmed that ██████ was assigned to ATU by Vivature and was supposed to electronically review treatments rendered by ATU athletic trainers. However, B.W. confirmed that ██████ never physically treated any ATU athletes, never came to ATU's campus, and never spoke with B.W.

21.     Yet ██████ was listed as the "servicing provider" on over $230,000 worth of claims submitted to BCBS Arkansas on behalf of ATU.  Based on the representation that a physician was the servicing provider, BCBS Arkansas reimbursed over $12,000 for these claims, which were deposited into Vivature accounts owned and controlled by **Bass** and processed at Veritex Bank locations, including those in the Eastern District of Texas.

22.     For **Scott's** role in the conspiracy, over a six-year period, **Bass** and ██████ transferred at least $1 million to the Veritex 9062 account held in the name of ██████ **B.** ██████ D.O. PC.  At least $500,000 of these funds were ultimately transferred to a different personal account controlled by ██████

23.     Vivature's athletic billing scheme, at the direction of **Bass** and ██████ also involved other physicians and extended to universities around the country.  In sum, the

defendants fraudulently obtained at least $50 million in paid claims as part of their athletic

billing scheme.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO

Violation: 18 U.S.C. § 1349, 1347
(Conspiracy to Commit Healthcare
Fraud)

24.     The General Allegations section of this Indictment is realleged and
incorporated by reference as though fully set forth herein.

25.     From in or around October 2020 and continuing up through and including
January 2022, in the Eastern District of Texas and elsewhere, the defendants, **Mouzon
Bass, III**,                         and                         along with others both known and unknown
to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree
to violate 18 U.S.C. § 1347, healthcare fraud, that is, to obtain, by means of materially false
and fraudulent pretenses, representations, and promises, money and property owned by and
under the custody and control of the Health Resources and Services Administration
("HRSA"), which operated a healthcare benefit program as defined in Title 18, United
States Code, Section 24(b), in connection with the payment of healthcare benefits, items,
and services.

### COVID-19 Testing and HRSA Reimbursements

26.     Between January 12, 2021, and June 10, 2022, the United States instituted a
federal order that all air passengers arriving from a foreign country to the United States
provide proof of a negative COVID-19 test or documentation of having recovered from
COVID-19.   The order applied to all travelers regardless of citizenship or originating

location.  To encourage Americans to travel abroad during the pandemic, many hotels and resorts began offering COVID-19 testing to American travelers returning home.

27.     Since 1982, the Health Resources and Services Administration ("HRSA") was a taxpayer-funded federal program dedicated to providing equitable healthcare to the nation's highest-need communities serving people who are geographically isolated and economically or medically vulnerable.  HRSA programs supported people with low incomes, people with HIV, pregnant people, children, parents, rural communities, transplant patients, and other communities in need, as well as the health workforce, health systems, and facilities that care for them.  Through HRSA, the U.S. Department of Health and Human Services provided claims reimbursement to healthcare providers for testing uninsured individuals for COVID-19, treating uninsured individuals with a COVID-19 diagnosis, and administering COVID-19 vaccines to uninsured individuals.  The program did not cover or apply to insured individuals, nor did it cover COVID-19-related services administered outside the country.

### Overview of COVID-19 Billing Scheme

28.     Beginning in 2021 and during the COVID-19 pandemic, **Bass**, ███████ ████ and others affiliated with Vivature executed a scheme to fraudulently obtain HRSA government funds earmarked for COVID-19 testing provided to uninsured Americans. The defendants partnered with international resorts hosting American travelers abroad, offering to manage the billing and claims process for COVID-19 testing provided to these American travelers.  Then, the defendants submitted thousands of reimbursement claims

to HRSA for such travelers.  In submitting these claims, the defendants represented to the government that: (1) the travelers were uninsured; and (2) the testing took place at the medical offices of **Scott's** company Varsity Health, located in the United States.  In reality, these travelers actually had private insurance, and ▇▇▇ did not see these patients— effectively disqualifying the travelers from the HRSA program.  In addition to these American travelers, the defendants also submitted HRSA reimbursement claims for COVID-19 testing administered to insured students at high schools and universities contracted by Vivature.  Like the travelers, these insured students were ineligible for reimbursements under HRSA.

29.    Using the fraud proceeds, **Bass** and ▇▇▇ paid ▇▇▇ for his participation in the scheme, paid themselves salaries and commissions, and purchased high-dollar luxury items and real estate.  In total, the defendants fraudulently obtained over $20 million from the HRSA program.

### Purpose of the Conspiracy

30.    It was the general purpose of the conspiracy for **Bass**, ▇▇▇ ▇▇▇ and their co-conspirators to unlawfully and unjustly enrich themselves by obtaining government funds from HRSA through materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Conspiracy

31.    The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a. The defendants and their co-conspirators arranged with representatives of international resorts and educational institutions to provide COVID-19 billing services;

b. The defendants and their co-conspirators communicated with each other via phone, in-person meetings, and emails;

c. The defendants and their co-conspirators opened businesses to conduct the fraud and opened bank accounts to receive, deposit, and transfer fraudulently obtained reimbursements;

d. The defendants and their co-conspirators obtained individuals' healthcare information, including personal identifiers and health insurance information, without their knowledge;

e. The defendants and their co-conspirators knowingly submitted COVID-19 test reimbursement claims to HRSA for insured individuals, despite knowing HRSA only covered uninsured populations;

f. The defendants and their co-conspirators included materially false and fraudulent representations on the HRSA claims, including falsely stating that ▓▓▓ was the servicing provider for COVID-19 testing and that the testing took place in the United States;

g. The defendants and their co-conspirators paid ▓▓▓ for his role in the scheme, including for the fraudulent use of **Scott's** NPI number and credentials on claims paperwork;

h. The defendants and their co-conspirators paid the international resorts and the educational institutions a portion of the reimbursements they received;

i. The defendants, using the fraudulently obtained proceeds, paid each other and co-conspirators salaries and commissions and purchased high-dollar luxury items, including multimillion-dollar real estate;

j. The defendants caused financial transactions that were processed by Veritex Bank at locations in the Eastern District of Texas;

k. The defendants caused wire transmissions that affected interstate and foreign commerce by using the financial banking system and causing the claims to be submitted to HRSA.

### Acts in Further of the Conspiracy

#### *The Defendants' Arrangements with the International Resorts*

32.     Between 2021 and 2022, many international resorts provided complimentary COVID-19 tests for their guests.  Vivature offered the resorts insurance billing and claims services for COVID-19 testing, and in turn, shared revenue received from reimbursement claims.  Vivature entered into agreements with numerous international resorts in the Caribbean regarding this arrangement.  For instance, on or about August 25, 2021, ██████ on behalf of Vivature, executed a COVID-19 billing contract with Grace Bay Resorts in the islands of the Turks and Caicos, to pay the resort 60% of the gross collections received, with Vivature retaining the remaining 40%.

33.     Pursuant to the agreement, Vivature employee with initials F.J. emailed the resort, copying **Bass**, ██████ and ████ stating:  "I am reaching out to you on behalf of **Muzzy** to inform you that our Medical Director, **Dr.** ████ will be visiting the Grace Bay Resort on Thursday, November 11th to see the COVID testing operations and meet their team.  **Dr.** ████ will also be visiting other companies in Turks and Caicos who are currently working with us and have a contract with our company for a brief introduction & talk more about our services related to COVID [.]"

#### *Fraudulent COVID-19 Reimbursement Claims for C.D. and D.D.*

34.     In or around October 2021, an individual with initials D.D. and his spouse C.D. visited the Shore Club Hotel, believed to be a Vivature-contracted resort, in the

Indictment
Page 15 of 22

islands of Turks and Caicos.  At the time, C.D. and D.D. were both insured by BCBS Texas.

Shortly before leaving the resort, on or about November 13, 2021, hotel staff administered

complimentary COVID-19 tests so that C.D. and D.D. could provide documentation upon

their return to the U.S.

35.     In an October 2023 interview with law enforcement agents, D.D. confirmed

the following regarding D.D. and C.D.'s visit to the Shore Club Hotel:  (1) although both

C.D. and D.D. were insured by BCBS Texas at the time of the visit, the hotel never

requested or obtained their insurance information; (2) the COVID-19 tests were

complimentary for guests; (3) C.D. and D.D. never met or interacted with an individual or

physician named ▮▮▮ and (4) C.D. and D.D. were never advised that their COVID-19

tests would be billed to the United States government or their private insurance.

36.     Despite these facts, in or around December 2021, Vivature submitted

reimbursement claims for C.D. and D.D.'s COVID-19 tests.  For C.D., Vivature submitted

a claim to HRSA, which listed ▮▮▮ or **Scott's** entity Varsity Health as the servicing

provider, which included **Scott's** NPI and noted a place of service as a medical facility

within the United States.  Meanwhile, Vivature submitted a separate claim for D.D. to

BCBS Texas, which also listed ▮▮▮ as the servicing provider.  Based on these

representations, HRSA reimbursed Vivature $74.29 and BCBS Texas reimbursed Vivature

approximately $41.38.  These payments were deposited in accounts owned and controlled

by **Bass**.

37.     Vivature, at the direction of **Bass** and ▮▮▮ submitted similar claims to

HRSA for insured travelers returning from other international resorts, as well as for insured student athletes at high schools and universities otherwise ineligible for HRSA reimbursements. In most instances, ▮▮▮ or **Scott's** company Varsity Health was listed as the servicing provider. Many of the resulting reimbursement deposits were processed at Veritex Bank locations in the Eastern District of Texas.

38.    For **Scott's** assistance in the scheme, **Bass,** ▮▮▮ and Vivature agreed to pay ▮▮▮ 1% of net collections, and ultimately paid ▮▮▮ over $500,000 for his role in this scheme and others. In exchange for the international resorts' cooperation in Vivature's scheme, **Bass** and others sent over $6.9 million to these resorts per their contracts.

39.    During their scheme, the defendants submitted several thousand individuals claims to HRSA and fraudulently obtained over $20 million in government funds.

All in violation of 18 U.S.C. § 1349.

## COUNT THREE

> Violation: 18 U.S.C. § 1956(h)
> (Conspiracy to Commit Money
> Laundering)

40.     Paragraphs 1 through 39 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

41.     From in or around 2014 and continuing up through and including the date of this Indictment, in the Eastern District of Texas and elsewhere, the defendants, **Mouzon Bass, III,** ▮▮▮▮▮▮▮ and ▮▮▮ ▮▮▮ along with others both known and unknown to the Grand Jury, did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to violate 18 U.S.C. § 1956 and 1957, to wit:

  a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343 and healthcare fraud in violation of 18 U.S.C. § 1347, with the intent to promote the carrying on the same specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

  b. to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343 and healthcare fraud in violation of 18 U.S.C. § 1347, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

c. to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, that is, wire fraud in violation of 18 U.S.C. § 1343 and healthcare fraud in violation of 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1957.

42.      Over the course of the schemes described in Counts One and Two, the defendants engaged and participated in thousands of financials transactions with the fraudulently obtained proceeds.

a. Certain transactions with fraudulently obtained proceeds were designed to promote and encourage the continued participation of co-conspirators in the scheme.  For instance:

- Between 2018 and 2023, Vivature, at the direction of **Bass** and ████ transferred at least $1 million to the Veritex 9062 account in the name of ████ █ ██ D.O. PC.

- Between 2016 and 2023, **Wilson's** BOA 9903 account received at least $2.9 million from accounts controlled by **Bass**, including from the Veritex 1200 account.

- In 2021 and 2022, **Bass** and ████ paid the international resorts at least $6.9 million for the resorts' role in the scheme from the Veritex 1200, Veritex 1277, and Veritex 1278 accounts.

b. Other transactions with fraudulently obtained proceeds were intended to disguise and conceal the true nature of the defendants' fraudulent conduct. For example:

- Between 2014 and 2023, the defendants used at least 200 different bank accounts to set up regular transfers to/from umbrella accounts receiving income from other sources.

c. Using the fraudulently obtained proceeds, the defendants also engaged in dozens of personal transactions in excess of $10,000 to fund their lifestyle, including the following:

- On or about March 1, 2023, from the Veritex 1200 account, **Bass** made an approximately $1 million payment toward the purchase of a yacht.  On or about June 1, 2023, from the same account, **Bass** made another approximately $2.8 million payment toward the purchase of that same yacht.

- On or about October 29, 2020, from the Veritex 1278 account, **Bass** made a payment of approximately $4.09 million on a residential property located in Highland Park, Texas, valued at over $7 million.

- On or about February 17, 2022, from the Veritex 1277 account, **Bass** made a payment of approximately $3.85 million toward the purchase of a residential property in Mexico valued at over $11 million.

- On or about November 30, 2020, from the BOA 9903 account, ████████ wire transferred approximately $75,000 to a title company for the purchase of a lake house located in Afton, Oklahoma valued at approximately $500,000.

All in violation of 18 U.S.C. § 1956(h).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461

1.      The allegations contained in Counts 1, 2, and 3 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2.      Upon conviction of any violation of 18 U.S.C. § 1349, the defendants, **Mouzon Bass, III**, ▮▮▮▮▮▮ and ▮▮▮▮▮ shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The property, which is subject to forfeiture, includes but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

3.      Upon conviction of any violation of 18 U.S.C. § 1956, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1), including a money judgment representing funds involved in the offense.

4.      Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

        a.  Cannot be located upon the exercise of due diligence;

    b. Has been transferred, or sold to, or deposited with a third party;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, pursuant to 21 U.S.C.§ 853(p), as incorporated by 28 U.S.C. § 2461(c).

    5.    By virtue of the commission of the offenses alleged in this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

    All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

                    A TRUE BILL

                    _____

                    GRAND JURY FOREPERSON

DAMIEN M. DIGGS
UNITED STATES ATTORNEY


_____

ANAND VARADARAJAN          Date
Assistant United States Attorney

Indictment
Page 22 of 22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | Case No. 4:24cr7 |
| | § | Judge |
| MOUZON BASS, III (1) | § | |
| a/k/a "Muzzy" | § | |
| | § | JAN 1 0 2024 |
| | § | |
| | § | Clerk, U.S. District Court |
| | | Texas Eastern |

FILED

## NOTICE OF PENALTY

### COUNT ONE

<u>Violation</u>:     18 U.S.C. §§ 1349 (Conspiracy to Commit Wire Fraud)

<u>Penalty</u>:      Not more than 20 years imprisonment, a fine not to exceed $250,000,
or both; supervised release of not more than 3 years.

<u>Special
Assessment</u>:      $100.00

### COUNT TWO

<u>Violation</u>:     18 U.S.C. §§ 1349 (Conspiracy to Commit Healthcare Fraud)

<u>Penalty</u>:      Not more than 10 years imprisonment, a fine not to exceed $250,000,
or both; supervised release of not more than 3 years.

<u>Special
Assessment</u>:      $100.00

### COUNT THREE

<u>Violation</u>:     18 U.S.C. § 1956(h) (Conspiracy to Commit Money
Laundering)

<u>Penalty</u>:      Not more than 20 years imprisonment, a fine not to exceed
$250,000, or both; supervised release of not more than 3 years.

<u>Special
Assessment</u>:      $100.00

Notice of Penalty