# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 4:24-CR-7-ALM-AGD** |
| | § | **Judge Mazzant/Judge Durrett** |
| | § | |
| **MOUZON BASS, III (1),** | § | |
| **a/k/a "Muzzy," et al.** | § | |
| | § | |

### DEFENDANT MOUZON BASS, III'S MOTION TO SUPPRESS

## <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION .................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 6

    A.  Vivature Launches a Civil Lawsuit Against BCBS KS Relating to Vivature's Billing for Services Rendered by Athletic Trainers................................................. 6

    B.  Shortly After Mr. Bass Is Indicted, the Government Applies for and Obtains a Search Warrant Without Mentioning the Overlapping BCBS KS Litigation or the Likelihood of Seizing Privileged Materials................................................. 7

    C.  Mr. Bass Reviews the Seized Hard-Copy Documents and Discovers Privileged Material Relating to the BCBS KS Litigation........................................ 8

    D.  Mr. Bass Discovers Multiple Issues with the Government's Filter Processes. ...... 9

    E.  The Government Moves the Hard-Copy Documents from the FBI's Possession to the Filter Team's Possession but Downplays the Continuing Discovery and Privilege Issues. ........................................................................... 11

III.  LEGAL STANDARD........................................................................................... 13

IV.  ARGUMENT AND AUTHORITY ....................................................................... 13

    A.  The Court Should Apply the Exclusionary Rule Because the Government Repeatedly Disregarded the Attorney-Client Privilege, Resulting in Violations of Mr. Bass's Fourth and Fifth Amendment Rights........................... 14

        i.  The Government Failed to Seek Authorization to Seize Privileged Materials It Knew Existed, Failed to Implement a Filter Protocol, and then Misrepresented Its Interactions with the Defense About the Seized Materials...................................................................................... 14

        ii.  The Government's Repeated Misconduct Violates the Fourth and Fifth Amendments and Thus More than Justifies Application of the Exclusionary Rule. ................................................................................... 19

V.  CONCLUSION..................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Auclair,*
    961 F.2d 65 (5th Cir. 1992) ................................................................................16

*Fisher v. United States,*
    96 S. Ct. 1569 (1976) ........................................................................................14

*Harbor Healthcare Sys., L.P. v. United States,*
    5 F.4th 593 (5th Cir. 2021) .................................................................14, 15, 16, 19

*Heebe v. United States,*
    No. 10-3452, 2012 WL 3065445 (E.D. La. July 27, 2012) .................................17

*Herring v. United States,*
    555 U.S. 135 (2009) .....................................................................................12, 13, 19

*Orchestrate HR, Inc. et al. v. Blue Cross Blue Shield Kansas,*
    5:19-cv-04007-DDC (D. Kan. Jan. 19, 2019) ...................................................6

*In re Sealed Case,*
    29 F.3d 715 (D.C. Cir. 1994) ............................................................................16

*In re Sealed Petitioner,*
    106 F.4th 397 (5th Cir. 2024) ...........................................................................14

*In re Search of 5444 Westheimer Rd. Suite 1570, Houston, Texas, on May 4, 2006,*
    No. H-06-238, 2006 WL 1881370 (S.D. Tex. July 6, 2006) .............................17

*United States v. Brown,*
    No. CV H-17-567-1, 2023 WL 5939892 (S.D. Tex. Sept. 12, 2023).................14

*United States v. Carr,*
    83 F.4th 267 (5th Cir. 2023) .........................................................................14, 19

*United States v. Carter,*
    4:23-cr-225, ECF No. 94-1 ...............................................................................5

*United States v. Guerrero-Barajas,*
    240 F.3d 428 (5th Cir. 2001) ............................................................................13

*United States v. Leon,*
    468 U.S. 897 (1984)..........................................................................................12

*United States v. Pipkins*,
    528 F.2d 559 (5th Cir. 1976) ................................................................................14

**Statutes**

18 U.S.C. § 1343 ..........................................................................................................7

18 U.S.C. § 1347 ..........................................................................................................7

18 U.S.C. § 1349 ..........................................................................................................7

18 U.S.C. § 1956(h) ......................................................................................................7

**Other Authorities**

1 Scott N. Stone & Robert K. Taylor, Testimonial Privileges § 1.21 (2d ed. 1993) ....................16

Fed. R. Crim. P. 41(g) ................................................................................................15

U.S. Const. amend. IV ......................................................................................12, 15, 19

U.S. Const. amend. V ..........................................................................................5, 13, 19

Defendant Mouzon Bass, III ("Mr. Bass") respectfully shows the Court as follows:

## I.    INTRODUCTION

The government crossed a constitutional line. The FBI and other members of the government trial team knowingly—or, at the very least, recklessly—obtained and reviewed privileged materials created in connection with ongoing civil litigation, the subject matter of which directly relates to the criminal charges against Mr. Bass. The government then used these materials to further its investigation into Mr. Bass, without any prior effort to screen for privilege. While the government now admits it seized privileged materials associated with the ongoing civil litigation (which Mr. Bass's wholly owned company, Vivature, Inc. ("Vivature") initiated and prosecuted), that admission doesn't make up for the government's botched filter review or undo its later use of the unfiltered documents in witness interviews. Indeed, the admission merely confirms the government's intrusion into Mr. Bass's and Vivature's attorney-client privilege and its violation of Mr. Bass's constitutional rights. The only remedy now is to suppress the seized material (along with any derivative evidence) and to disqualify the FBI agents who knowingly used it in their investigation.

The government's reckless conduct traces back to the original indictment. On January 19, 2024, nine days after the indictment, FBI agent Jason Rennie ("Agent Rennie") applied for and obtained a warrant to search and seize hard-copy and electronic materials from Vivature's offices. At the time, Agent Rennie knew about Vivature's ongoing civil litigation against Blue Cross Blue Shield Kansas ("BCBS KS"), involving Vivature's billing for services rendered by athletic trainers—the same conduct at issue in Count I of the indictment. And Agent Rennie knew the identity of Vivature's attorney in that litigation, Jose Portela ("Mr. Portela"). The two even spoke on the day of the search, January 22, 2024. Despite this knowledge, Agent Rennie did not include anything in his affidavit about the BCBS KS lawsuit or the inevitability of the search turning up

privileged materials related to the BCBS KS litigation, as it ultimately did. Ex. 1, January 2024 Search Warrant and Affidavit ("January Search Warrant"),

Over the following months, the government's disregard for Mr. Bass's attorney-client privilege became increasingly apparent. While the government knew the January 22, 2024 search would capture privileged materials relating to the BCBS KS litigation, the government executed the search without any filter protocol in place. The government's first filter memo confirms as much as it is dated February 11, 2024, several weeks after the search occurred.

---

**MEMORANDUM**

**TO:**     Filter Team Agents – FBI SA Haley Armentrout; FBI SA Jerrod McCormick

**FROM:**   Prosecution Team AUSA – Anand Varadarajan
            Filter Team AUSA – Russell James

**CC:**     All members of Prosecution and Filter Team

**DATE:**   February 11, 2024

**RE:**     Filter Team Instructions for Vivature Investigation

---

Ex. 2, February 11 Filter Protocol. The memo also misrepresented its authorship and intended recipients. The face of the memo identifies AUSA Russell James ("AUSA James") as the filter team AUSA and one of the purported authors of the document. And it lists FBI agents Haley Armentrout ("Agent Armentrout") and Jerrod McCormick ("Agent McCormick") as the two filter team agents. But, as AUSA James represented during the July 30 hearing, he didn't know of his appointment until April 14, 2024. Neither did Agents Armentrout and McCormick.

> **April 14th, the filter team agents and I were notified of the appointment**. There was a February 11th memo that went out that basically appointed us; two agents from the FBI as filter team agents and myself as the filter team AUSA. **We were made aware of that on April 14th.**

Ex. 3, July 30, 2024 Hrg. Tr. at 16 (emphases added).

DEFENDANT MOUZON BASS, III'S MOTION TO SUPPRESS – Page 2

Of course, AUSA James could not have authored a memo on February 11, 2024 when he was not even aware of his appointment to the filter team until April 14, 2024. And Agents Armentrout and McCormick could not have known they were part of the filter team in February when—as AUSA James stated—they only learned of their appointment on April 14, 2024. Indeed, on information and belief, Agent McCormick had not even graduated from the FBI Academy on February 11, 2024. Given these misrepresentations, it is unclear who authored the February 11 Filter Protocol and what agents (if any) worked on the initial filter team.

What is clear is that no real filter review occurred—particularly for the hard-copy documents—and the government took advantage of this lack of oversight. Without any filter protocol in place, the FBI conducted an unconstrained, post-search "review of *all* the physical items . . . seized" in connection with the January Search Warrant, including—as Mr. Bass's counsel later discovered—notes referencing "Jose," "Jose—our atty," "BCBS damages sheet," and "Kansas BCBS Project." *See* Ex. 4, June 3, 2024 Search Warrant Affidavit and Order ("June Search Warrant") ¶ 32 (emphasis added). The trial team then used these hard-copy documents in subsequent interviews, without any prior filtering. *See* Ex. 5, Annette Linahan FBI 302 (discussing "Jose" at the start of the interview before turning to other hard-copy materials the FBI seized in January 2024). And while the government released two supplemental filter memos in June, neither of these memos referenced the seized hard-copy documents, which the FBI had already reviewed. *See* Ex. 6, June 6 Filter Protocol; Ex. 7, June 25 Filter Protocol.

What's more, all of this occurred without Mr. Bass's counsel having any opportunity to review the seized hard-copy documents. Indeed, the government did not grant Mr. Bass access to the hard-copy documents until July 9, 2024, months after the seizure and months after the government started using the unfiltered materials in witness interviews. The in-person review

confirmed the presence of numerous privileged materials in the hard-copy documents. It also uncovered hand-written notes from FBI agents—with notations such as "BCBSKS lawsuit"—mixed in with the other privileged materials. Although the FBI agents provided scanned copies of the hard-copy documents, they refused to provide their handwritten notes, removing the notes from the documents prior to sending them to the defense.

In the days after this in-person review, Mr. Bass's counsel and Vivature's counsel each sent separate letters to AUSA James (the filter team AUSA) and AUSA Anand Varadarajan ("AUSA Varadarajan," the prosecution team AUSA), flagging the privileged material in the hard-copy documents and the lack of any filter protocol. Ex. 8, Bass Privilege Letter to AUSA James; Ex. 9, Bass Privilege Letter to AUSA Varadarajan. The letters further urged the trial team to immediately cease all review and use of the hard-copy documents until the filter team completed a proper privilege review. Weeks later, on August 6, 2024, the government conceded, moving the hard-copy documents out of the FBI's uncensored possession and into the possession of the filter team—where they should have been when they were originally seized in January.



Less than 48 hours after the government moved the hard-copy documents into the filter team's possession, however, Agent Rennie submitted an affidavit that mischaracterized defense counsels' review of the hard-copy documents. In that affidavit, Agent Rennie claimed thar Mr. Bass's counsel—along with other attorneys—pored through the hard-copy documents, collectively spending over 20 hours conducting the review. And, according to Agent Rennie, "[a]t no point during that review or immediately after did the attorneys flag any problems with these materials, ***raise any privilege concerns***, request to segregate the materials, or reach out to me or a filter agent to remove certain documents or ***cease review***." *United States v. Carter*, 4:23-cr-225, ECF No. 94-1 ¶ 12 ("Agent Rennie Affidavit") (emphases added). But those statements are not true. The letters Mr. Bass's counsel and Vivature's counsel sent in July 2024, roughly a week after reviewing the materials, raised these precise issues ***and expressly stated that the trial team should immediately cease its review***. The statements therefore do not justify Agent Rennie's involvement or his uncensored review of the hard-copy documents, as the government has recently claimed.

While Mr. Bass has long known the hard-copy documents contained privileged material, the government has now confirmed that multiple hard-copy documents contained privileged material relating to the BCBS KS lawsuit. *See* Ex 10, AUSA James August 4, 2025 Email and Attachment. The government violated Mr. Bass's Fourth and Fifth Amendment rights by knowingly—or, at a minimum, recklessly—seizing and using these admittedly privileged materials. And the government caused irreversible damage to Mr. Bass and his defense in doing so. The only way to prevent further damage is to suppress the seized material along with any derivative evidence and disqualify Agent Rennie (and any other FBI agents who reviewed the seized hard-copy documents) from any further participation in the case.

## II.    BACKGROUND

### A.    Vivature Launches a Civil Lawsuit Against BCBS KS Relating to Vivature's Billing for Services Rendered by Athletic Trainers.

In January 2019, Orchestrate HR, Inc. ("Orchestrate") and Vivature sued BCBS Kansas, claiming that BCBS KS defamed Orchestrate and Vivature in relation to their billing for services rendered by athletic trainers at universities.[1] *See* Ex. 11, *Orchestrate HR, Inc. et al. v. Blue Cross Blue Shield Kansas*, 5:19-cv-04007-DDC (D. Kan. Jan. 19, 2019), Docket Sheet and Complaint. Mr. Portela represented Orchestrate and Vivature in the lawsuit. *See id.*

On February 11, 2020, Agent Rennie's supervisor—FBI agent Christopher Ranney ("Agent Ranney")—emailed BCBS KS's investigator about claims Vivature submitted to BCBS KS "on behalf of colleges/universities." *See* Ex. 12, FBI Form 302 dated February 11, 2020.[2] And on two separate occasions thereafter, Agent Ranney spoke with the attorney representing BCBS KS in the civil litigation against Vivature. *See* Ex. 13, FBI Form 302s dated July 22, 2020, and July 7, 2021; *see also* Ex. 14, Notice of Appearance of Mr. Cross. During these conversations, the attorney for BCBS KS informed Agent Ranney that the court had ordered BCBS KS to disclose discovery to Orchestrate and Vivature, including documents containing BCBS KS's prior communications with the FBI. *See* Ex. 13, FBI Form 302s dated July 22, 2020, and July 7, 2021

---

[1] Orchestrate HR, Inc. and Vivature originally brought this lawsuit in March 2018 in Texas state court. *See Orchestrate HR, Inc. et al. v. Blue Cross Blue Shield Kansas*, 5:19-cv-04007-DDC, ECF No. 590 at 8. Orchestrate, like Vivature, is wholly owned by Mr. Bass.

[2] Mr. Bass is not publicly filing the FBI Form 302s referenced in this Motion out of an abundance of caution for this Court's Protective Order. Mr. Bass can submit the FBI Form 302s for in-camera review or refile them publicly, depending on the Court's preference.

**B.    Shortly After Mr. Bass Is Indicted, the Government Applies for and Obtains a Search Warrant Without Mentioning the Overlapping BCBS KS Litigation or the Likelihood of Seizing Privileged Materials.**

On January 10, 2024, the grand jury returned a three-count indictment charging Mr. Bass, Dr. Robert Brent Scott ("Dr. Scott"), and Mr. Lance Wilson ("Mr. Wilson") (collectively, "Defendants") with violating: (1) 18 U.S.C. §§ 1349, 1343 (Conspiracy to Commit Wire Fraud); (2) 18 U.S.C. §§ 1349, 1347 (Conspiracy to Commit Healthcare Fraud); and (3) 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering). *See United States v. Bass*, 4:24-cr-7, ECF Nos. 1, 9 ("Original Indictment"). Relevant here, Count I alleges Defendants committed wire fraud through Vivature's billing insurers for services provided by athletic trainers at universities—the same subject matter as the BCBS KS lawsuit.[3]

Days later, on January 19, 2024, Agent Rennie applied for a warrant to search and seize electronic and hard-copy materials from Vivature's offices. *See* Ex. 1, January Search Warrant. Although the FBI knew of Vivature's ongoing civil litigation against BCBS KS since at least 2020, Agent Rennie's affidavit did not make any mention of this directly related litigation. *See id.* Nor did it include any language to notify the Magistrate Judge of the high likelihood that the search would capture privileged materials created for purposes of that litigation. *See id.*

On January 22, 2024, the government executed the search warrant at Vivature's offices, seizing electronic communications and physical documents such as employee notebooks and binders. Mr. Portela, Vivature's counsel in the BCBS KS litigation, called Agent Rennie during the search to request a copy of the indictment, which he knew existed due to Mr. Wilson's arrest earlier that day. *See* Ex. 15, FBI 302 Form dated January 25, 2024. Agent Rennie told Mr. Portela

---

[3] The Grand Jury has since returned a First Superseding Indictment against Mr. Bass, Dr. Scott, and Mr. Wilson. ECF No. 203. But Count I still concerns Vivature's billing for services provided by athletic trainers.

he couldn't comment. He then proceeded with the search. Less than two weeks later, on February 2, 2024, Mr. Bass's newly retained defense counsel provided the government with a list of attorneys and attorney emails to apply as part of its filter protocol, which Mr. Bass's counsel understood—at least at the time—would apply to both the electronic communications and the hard-copy documents seized as a result of the search.

But that didn't happen, at least for the hard-copy documents the government seized. As Agent Rennie stated in his affidavit in support of a subsequent search warrant for Vivature's cloud servers,[4] the "FBI conducted a post search review of *all physical items which were seized* from the offices of Vivature, Inc., on January 22, 2024." *See* Ex. 4, June Search Warrant (emphasis added). Nothing was excluded or screened for privilege.

### C. Mr. Bass Reviews the Seized Hard-Copy Documents and Discovers Privileged Material Relating to the BCBS KS Litigation.

On July 9, 2024, Mr. Bass's counsel conducted an in-person review of the seized hard-copy documents at the FBI's Plano office. The review revealed multiple privileged documents, including—among other materials—an email from Mr. Portela to Mr. Bass and more than 10 pages of notes created by a Vivature employee from meetings with Mr. Portela about the BCBS KS litigation. The notes included references to "Jose" and "BCBS claims" alongside details relating to Vivature's billing for services provided by athletic trainers—the precise conduct at issue in the BCBS KS litigation (in which Mr. Portela represented Vivature) as well as Count I in the Original Indictment. In addition to these documents, Mr. Bass's counsel discovered handwritten notes from the FBI explicitly referencing the BCBS KS litigation.

---

[4] Agent Rennie's June 3 affidavit—like his January 19 affidavit—contained no reference to the BCBS KS litigation or any mention of the likelihood of recovering privileged materials related to that litigation as part of the search. *See* Ex. 4, June Search Warrant.

After the review, Mr. Bass's counsel requested copies of both the hard-copy documents and the FBI's handwritten notes. Ex. 16, Email Chain Between Agent Rennie and Bass Counsel. Agent Rennie sent the hard-copy documents but refused to provide the handwritten notes. He claimed the handwritten notes were "inadvertently left" behind. *Id.*

Counsel for Mr. Bass and counsel for Vivature each sent letters to the AUSAs following the review of the hard-copy documents and the exchange with Agent Rennie. Vivature's counsel sent the first set of letters on July 15, 2024—one letter to filter team AUSA James, and a separate letter to trial team AUSAs Varadarajan and Adrian Garcia ("AUSA Garcia"). Mr. Bass sent his own set of letters two days later. All four letters contained the same message: Counsels' review of the hard-copy documents revealed privileged materials, and the government's past and continuing review (and use) of these materials constitutes an intrusion into Mr. Bass' and Vivature's attorney-client privilege. Ex. 8, Bass Privilege Letter to AUSA James; Ex. 9, Bass Privilege Letter to AUSA Varadarajan. Mr. Bass's counsel closed their letters by demanding the government "**immediately cease** (1) all review of the hard-copy documents . . . and (2) all use of the hard-copy documents" until the government filter team completes a privilege review in accordance with Fifth Circuit law. Ex. 8, Bass Privilege Letter to AUSA James; Ex. 9, Bass Privilege Letter to AUSA Varadarajan. (emphasis in original). The government did not respond.

### D.    Mr. Bass Discovers Multiple Issues with the Government's Filter Processes.

This Court set a hearing for July 30, 2024 to address a series of discovery- and privilege-related issues in this case as well as the related case involving Dr. Kyle Carter ("Dr. Carter"). *United States v. Carter*, 4:23-cr-225. The day before the hearing, Mr. Bass's counsel—along with the other defense attorneys—conferred with filter team AUSA James and separately with trial team AUSAs Varadarajan and Garcia about the seized hard-copy documents. The responses were dizzying. AUSA James pointed to AUSA Varadarajan and AUSA Garcia, claiming the seized

hard-copy documents were outside the scope of the filter team's protocol. AUSAs Varadarajan and Garcia, in turn, pointed back at AUSA James and said that he could answer any questions about the filter protocol for the hard-copy documents. They further informed counsel that the FBI investigative agents still possessed the entirety of the hard-copy documents.

The hearing the next day raised more questions about the government's filter process. During the hearing, AUSA James (the filter team AUSA) informed the Court that he and "the filter team agents" were not "notified of the appointment" to the filter team until April 14, 2024. According to AUSA James, "[t]here was a February 11th memo that went out that basically appointed us[—]two agents from the FBI as filter team agents and myself as the filter team AUSA." And he along with the two agents from the FBI "were made aware of that on April 14," 2024. Ex. 2, July 30, 2024 Hrg. Tr. at 16. AUSA James further revealed that Agents Rennie and Ranney had access to the seized and unfiltered electronic data in April 2024. *See id.* But he revoked their access as soon as he learned of it on July 25, 2024. *See id.* at 17.

Following the hearing, AUSA James and AUSA Tom Gibson ("AUSA Gibson")[5] provided defendants with copies of three different filter protocols: one dated February 11, 2024; a second dated June 6, 2024; and a third dated June 25, 2024. The February 11 Protocol lists AUSA James as the filter team AUSA and one of the purported authors of the protocol, and it lists Agents

---

[5] AUSA Gibson is a supervisor in the U.S. Attorney's Office for the Eastern District of Texas and appears to have drafted the June 6 Protocol and the June 25 Protocol.

Armentrout and McCormick as the two filter team agents.[6] Ex. 2, February 11 Filter Protocol.[7] While the February 11 Protocol included seized physical items (such as the hard-copy documents) in its scope and indicated a pre-indictment review would occur, the June 6 Protocol and the June 25 Protocol contained no such language. The June 6 Protocol expressly indicated that the government never conducted a pre-indictment review. *See* Ex. 6, June 6 Protocol at 1. And neither protocol so much as referenced the seized hard-copy documents.

### E.    The Government Moves the Hard-Copy Documents from the FBI's Possession to the Filter Team's Possession but Downplays the Continuing Discovery and Privilege Issues.

On August 7, 2024, weeks after Mr. Bass and Vivature sent letters to the government about the privileged materials in the hard-copy documents, AUSA James informed defense counsel that the filter team had possession of the seized hard-copy documents "as of yesterday [August 6, 2024]." Ex. 17, AUSA James Email dated August 7, 2024. While the FBI no longer possessed the hard-copy documents as of August 6, 2024, the government still had not addressed the FBI's apparent unrestrained access to the seized electronic documents from at least April 2024 to July 25, 2024, when AUSA James terminated their access. Ex. 2, July 30, 2024 Hrg. Tr. at 17. So, Mr. Bass's counsel requested access logs, showing when and what the FBI agents accessed. Ex. 18, AUSA James Email dated August 9, 2024. But AUSA James refused to produce the access logs.

---

[6] Of course, as AUSA James represented during the hearing, neither he nor the agents were aware of their appointment until April 14, 2024. Indeed, based on information relayed by Agent Armentrout and Agent McCormick, Agent McCormick had yet to graduate from the FBI Academy on February 11.

[7] Agent Rennie later affirmed the details in the February 11 Protocol in an affidavit submitted in the related Dr. Carter case, referencing a February 2024 filter team that included an "AUSA assigned to the Beaumont office" (i.e., AUSA James) and "two Frisco-based special agents" (Agents Armentrout and McCormick). Agent Rennie Affidavit ¶ 6.

*Id.* ("[A]fter consultation with my chain of command **we will not be producing the logs at this time**." (emphasis added)). Instead, AUSA James referred Mr. Bass's counsel to the affidavit Agent Rennie submitted in connection with a motion to exclude in the related case involving Dr. Carter.

That affidavit included assertions about the electronic documents and the hard-copy documents.[8] As for the electronic documents, Agent Rennie conceded he received access to the electronic database before the filter team. But he claimed to have done nothing more than provide the filter team with privilege search terms. Agent Rennie Affidavit ¶¶ 7–10. And, when it came to the hard-copy documents, Agent Rennie claimed that defense counsel reviewed those documents for more than 20 hours and did not once "flag any problems with these materials, ***raise any privilege concerns***, request to segregate the materials, or reach out to me or a filter agent to remove certain documents or ***cease review***." *Id.* ¶ 12 (emphases added). He did not mention the four different letters Vivature's counsel and Mr. Bass's counsel sent to the government in the days following the in-person review.

In any event, roughly a year later, the government finally acknowledged the existence of privileged material in the seized hard-copy documents. Indeed, AUSA James's August 6, 2025 letter to defense counsel includes several documents that the government does not contest are privileged and another set of documents that the government will further discuss. Ex 10, AUSA James August 4, 2025 Email and Attachment.

---

[8] Agent Rennie's affidavit separately states that "the filter team continued to deliberate and negotiate with Vivature, [Dr.] Carter, and the Bass defendants on the appropriate filter protocol" through April 2024. *Id.* at 3–4. But the defendants had no discussions about the filter protocol with the government beyond sending filter terms shortly following the return of the Original Indictment.

## III.    LEGAL STANDARD

The Fourth Amendment forbids unreasonable searches and seizures. *Herring v. United States*, 555 U.S. 135, 136 (2009). While the Fourth Amendment "does not expressly preclude the use of evidence obtained in violation of its commands," the Supreme Court has "establish[ed] an exclusionary rule that . . . forbids the use of improperly obtained evidence." *Id.* at 139. The application of the rule turns on the objective reasonableness of all government actors and the degree to which exclusion will deter future misconduct. *Id.* (citing *United States v. Leon*, 468 U.S. 897, 923 n.24 (1984)); *id.* at 144. "[D]eliberate, reckless, or grossly negligent conduct" will trigger application of the rule. *Id.* at 144. So too will some "circumstances [involving] recurring or systemic negligence." *Id.* As long as the defendant proves the alleged misconduct and the resulting constitutional violation by a preponderance of the evidence (as Mr. Bass has more than done here), application of the rule is justified. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

## IV.    ARGUMENT AND AUTHORITY

The Court should apply the exclusionary rule because the government and its agents have repeatedly and deliberately (or, at the very least, recklessly) disregarded Mr. Bass's and Vivature's attorney-client privilege, violating Mr. Bass's Fourth and Fifth Amendment rights and causing significant prejudice. As detailed below, the government's actions are objectively unreasonable. The government knowingly seized and reviewed privileged materials (without authorization to do so), failed to implement proper filter protocols, and then used the unfiltered materials in subsequent witness interviews. This pattern of misconduct—which further included a series of governmental misstatements and inaccuracies—more than justifies application of the exclusionary rule in this case, both to address the current misconduct and to deter similar misconduct in the future. The Court should thus apply the rule to exclude all materials the government improperly obtained and

reviewed and to disqualify the FBI agents who knowingly used these materials in their post-indictment, post-seizure investigation.

A. **The Court Should Apply the Exclusionary Rule Because the Government Repeatedly Disregarded the Attorney-Client Privilege, Resulting in Violations of Mr. Bass's Fourth and Fifth Amendment Rights.**

The Government violated Mr. Bass's Fourth and Fifth Amendment rights by failing to notify the Magistrate Judges of Vivature's ongoing civil litigation—involving the exact same subject matter as Count I in the indictment—and the likelihood that the requested search would capture privileged material. The government compounded this impropriety by reviewing all the seized hard-copy documents (without any filter protocol in place) and then using the hard-copy documents in subsequent warrant applications and interviews. What's more, all of this was done knowingly, or at least recklessly, as the government knew of the ongoing litigation for at least three years prior to the grand jury's return of the Original Indictment. This conduct, further detailed below, more than justifies application of the exclusionary rule.

i. **The Government Failed to Seek Authorization to Seize Privileged Materials It Knew Existed, Failed to Implement a Filter Protocol, and then Misrepresented Its Interactions with the Defense About the Seized Materials.**

"Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." *Fisher v. United States*, 96 S. Ct. 1569, 1577 (1976). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." *Id.*; *accord Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593, 599 (5th Cir. 2021) ("The whole point of the privilege is privacy." (citing *Fisher*, 425 U.S. at 399)). Thus, "[t]he attorney-client privilege prevents disclosure of confidential communications by a client to his attorney while seeking legal advice." *United States v. Brown*, No. CV H-17-567-1, 2023 WL 5939892, at *4 (S.D. Tex. Sept. 12, 2023) (citing *United States v. Pipkins*, 528 F.2d 559, 562 (5th Cir. 1976)). The government does not get

a free pass to bypass these protections, even in criminal prosecution. *Cf. In re Sealed Petitioner*, 106 F.4th 397, 403–04 (5th Cir. 2024) (explaining how the attorney-client privilege protects even government officials accused of wrongdoing). Absent some exceptions (none of which apply here), the government must respect the privilege and take measures to uphold its protections. *See id.*; *cf. United States v. Carr*, 83 F.4th 267, 275–76 (5th Cir. 2023) (recognizing that a sufficiently outrageous governmental intrusion into the attorney-client privilege may violate the Fifth Amendment's due process protections).

The Fifth Circuit's decision in *Harbor Healthcare* exemplifies these principles, reaffirming the need for the government to respect the attorney-client privilege and demonstrating the consequences should the government decline to do so. *Harbor Healthcare*, 5 F.4th at 598–99. The case centered on a warrant application, and the government's failure to obtain "express authorization" from the Court to seize attorney-client privileged materials—which the government knew the requested warrant would capture. *See id.* While the district court found that the warrant cured any "callous disregard" the government may have shown towards the defendant's rights— including the government's continuing retention of the privileged materials following the seizure—the Fifth Circuit reversed that decision. *See id.* at 599–601. As the Fifth Circuit explained, the government disregarded the defendant's attorney-client privilege by failing to seek authorization from the Court to seize privileged materials the government knew to exist. *Id.* at 599. The government further disregarded the defendant's rights by improperly retaining the privileged materials following the seizure.[9] *Id.*

_____

[9] Admittedly, *Harbor Healthcare* involved a motion under Rule 41(g) of the Federal Rules of Criminal Procedure, not a motion to suppress. And the Fifth Circuit did state that Rule 41(g) and suppression "occupy two entirely distinct spheres within the universe of unlawful searches and seizures." *Id.* at 601. But these distinctions do not change the applicability of *Harbor Health*'s

The government's intrusion into Mr. Bass's and Vivature's attorney-client privilege[10] tracks and, in several instances, exceeds the government's intrusion into the defendant's attorney-client privilege in *Harbor Healthcare*. In both cases, the government applied for a warrant—knowing it would capture privileged materials—but failed to seek authorization to seize the privileged materials. Indeed, in this case, the FBI knew that the warrant for Vivature's offices would capture privileged materials from Vivature's ongoing civil litigation with BCBS KS, which involved the exact same subject matter as Count I in the indictment. The FBI knew because they communicated with BCBS KS and BCBS KS's counsel about the litigation with Vivature. Ex. 12, FBI Form 302 dated February 11, 2020; Ex. 13, FBI Form 302s dated July 22, 2020 and July 7, 2021. And Agent Rennie spoke to Vivature's civil counsel, Mr. Portela, on the day of the search. Ex. 15, FBI Form 302 dated January 25, 2024. Despite this knowledge, the FBI failed to notify the Court of the litigation or the likelihood of seizing such materials, much less seek express authorization from the Court to do so.

---

reasoning. As *Harbor Health* separately recognized, both suppression and Rule 41(g) concern unlawful searches and seizures under the Fourth Amendment. The distinction lies in the harm resulting from the Fourth Amendment violation and the procedural context in which the violation occurred. *See id.* at 600–01. In *Harbor Health*, there was no indictment and thus suppression would have done nothing to remedy the government's continuing intrusion into the defendant's attorney-client privilege. *Id.* The defendant merely needed the privileged materials returned. Here, the grand jury already returned the indictment, and the government improperly used the seized hard-copy documents to further its investigation. Suppression of the relevant evidence and witnesses at trial is therefore the appropriate remedy for the harm.

[10] Vivature and Mr. Bass share a common interest and Vivature remains a separate entity. Thus, as the common-interest privilege applies, and the government has acknowledged as much in previous communications with defense counsel. *See In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994) (citing *In re Auclair*, 961 F.2d 65, 69 (5th Cir. 1992)); 1 Scott N. Stone & Robert K. Taylor, Testimonial Privileges § 1.21, at 1–54 (2d ed. 1993) ("Where the same attorney represents two or more clients having a common interest, confidential communications made by those clients to the common lawyer will be protected from disclosure to third parties.").

Both cases further involved continuing government misconduct after the initial search and seizure. In *Harbor Health*, the government improperly seized and retained privileged material. *See Harbor Health*, 5 F.4th at 599. Here, the government reviewed documents known to contain privileged materials with no filter protocol in place; used the seized material in subsequent warrant applications and witness interviews; and has now refused to turn over handwritten notes from the FBI in reviewing the hard-copy documents. *See* Ex. 4, June Search Warrant ¶ 32; *See* Ex. 5, Annette Linahan FBI 302; Ex. 16, Email Chain Between Agent Rennie and Bass Counsel. Not only has the government refused to turn over the handwritten notes from the hard-copy documents, but the government has also refused to provide access logs showing when and to what extent the FBI agents accessed the unfiltered electronic communications.[11] Ex. 2, July 30, 2024 Hrg. Tr. at 17; Ex. 18, AUSA James Email dated August 9, 2024. While Agent Rennie claims that such unrestricted access is "standard procedure for the FBI," (Agent Rennie Affidavit ¶ 8), AUSA James's decision to immediately revoke Agent Rennie's access to the database (and Agent Ranney's access) belies any claim that this setup was business-as-usual. *See* Ex. 2, July 30, 2024 Hrg. Tr. at 17–19; Ex. 19, Forensic Review at 2–3.

This case further involves repeated governmental misrepresentations, an aggravating factor which was not present in *Harbor Health*.[12] Start with the February 11 Protocol, which listed AUSA

---

[11] As other courts in this Circuit have found, access to the trial team's access is critical to ensuring the privilege is protected. *See Heebe v. United States*, No. 10-3452, 2012 WL 3065445, at *5 (E.D. La. July 27, 2012) (explaining how it is proper to "require that the Government maintain a log of which prosecutors and Government agents had access to the potentially privileged materials in order to prevent further corruption"); *see also In re Search of 5444 Westheimer Rd. Suite 1570, Houston, Texas, on May 4, 2006*, No. H-06-238, 2006 WL 1881370, at *3 (S.D. Tex. July 6, 2006) (emphasizing the importance of implementing a pre-review taint team).

[12] The government's inability to identify the team responsible for the hard-copy documents underscores the government's recklessness and disregard toward Mr. Bass's and Vivature's

James as the filter agent and an author of the memo and Agents Armentrout and McCormick as the two appointed filter agents. Ex. 1, February 11 Protocol at 1. None of those representations were accurate. As AUSA James admitted to this Court, none of them even knew they were part of the filter team until April 14, 2024, more than two months later. *See* Ex. 2, July 30, 2024 Hrg. Tr. 16:8–13. And, as Agents Armentrout and McCormick represented to Vivature's counsel, Agent McCormick had not even graduated from the FBI academy on February 11, 2024. In addition to these misrepresentations, the February 11 Protocol stated that the government had conducted a pre-indictment review. Ex. 1, February 11 Protocol. It further stated that a filter team would process any seized physical items from Vivature's offices. *Id.* But no pre-indictment review ever happened, as the June 6 Protocol conceded. Ex. 6, June 6 Protocol. And the FBI investigative team reviewed all the hard-copy documents, without any prior privilege review or filter protocol taking place. Ex. 4, June Search Warrant ¶ 32

Agent Rennie's affidavit only adds to these misrepresentations. In the affidavit he submitted in the related case involving Dr. Carter, Agent Rennie doubled down on the misrepresentations in the February 11 Protocol, claiming that AUSA James and Agents Armentrout and McCormick made up the initial February 2024 filter team. Agent Rennie Affidavit ¶ 6 (stating that the February 2024 filter team included an "AUSA assigned to the Beaumont office" (i.e., AUSA James, who offices in Beaumont) and "two Frisco-based special agents" (i.e.,

---

attorney-client privilege. Mr. Bass raised this issue in separate conferences with AUSA James (the filter team) and AUSAs Varadarajan and Garcia (the trial team). AUSA James said the hard-copy documents were never within the scope of the filter team's review. The trial team in turn notified defense counsel that the hard-copy documents were still in the FBI's possession but then pointed back at the filter team for any further questions. While this who's-on-first routine from the government may not rise to the level of an explicit misrepresentation, it nonetheless illustrates the government's reckless disregard of Mr. Bass's and Vivature's attorney-client privilege.

Agents Armentrout and McCormick, both of whom are now assigned to the FBI's Frisco office). He then claimed that defense counsel did not ever "flag any problems with the[ hard-copy] materials, ***raise any privilege concerns***, request to segregate the materials, or reach out to me or a filter agent to remove certain documents or ***cease review***." *Id.* ¶ 12 (emphases added). Of course, defense counsel for Vivature and Mr. Bass sent four different letters alerting the government of the privileged materials in the government's possession and demanding the government cease all review until the completion of a proper filter review. *See* Ex. 8, Bass Privilege Letter to AUSA James; Ex. 9, Bass Privilege Letter to AUSA Varadarajan. Agent Rennie's statement is therefore deliberately false or made with reckless disregard for the truth. Either way, it further demonstrates the government's "callous disregard" towards Mr. Bass's and Vivature's attorney-client privilege. *See Harbor Health*, 5 F.4th at 599.

### ii. The Government's Repeated Misconduct Violates the Fourth and Fifth Amendments and Thus More than Justifies Application of the Exclusionary Rule.

Taken together, the governmental misconduct in this case exceeds the governmental misconduct at issue in *Harbor Health*, which the Court held amounted to a violation of the Fourth Amendment. Not only did the government fail to seek authorization to seize privileged materials in this case—as was the case in *Harbor Health*—but the government also reviewed and used the unfiltered materials for leverage in subsequent warrant applications and witness interviews. *See supra* § I.A.i. The government then refused to turn over FBI notes created during review of hard-copy documents that the government now concedes contained privileged information. Couple these intrusions into Mr. Bass's and Vivature's attorney-client privilege with the misrepresentations in the February 11 Filter Protocol and Agent Rennie's affidavit, and the resulting government intrusion becomes sufficiently outrageous to support a Fifth Amendment due process violation. *Carr*, 83 F.4th at 275–76.

The only appropriate remedy for these constitutional violations is the application of the exclusionary rule. Application of the rule in this case satisfies both the culpability and deterrence considerations that form the foundation of the rule. *See Herring*, 555 U.S. at 139, 144. The government knowingly intruded into Mr. Bass's and Vivature's attorney-client privilege, as the government was aware of the overlapping civil litigation for years prior to applying for the search warrant in January 2024. They then recklessly handled the privileged material by failing to implement a filter protocol for the hard-copy documents prior to the FBI agents' review and by using the unfiltered hard-copy documents in subsequent witness interviews. The culpability requirement for the exclusionary rule is therefore met.

The deterrence requirement is also satisfied in this case. Application of the rule will prevent the government from gaining an unfair advantage in this prosecution (i.e., a reward for violating Mr. Bass's and Vivature's attorney-client privilege). It will deter future government actors from so brazenly disregarding the attorney-client privilege. And it will ensure that the government treats filter protocols in criminal prosecutions with the seriousness they deserve, not the carelessness with which the government has shown here.

For these reasons, as well as the reasons stated in Section A.i., the Court should apply the rule to exclude all evidence seized as a result of the January Search Warrant and the June Search Warrant and to disqualify the FBI agents who knowingly used this material in their investigation.

## V.    CONCLUSION

For the foregoing reasons, Mr. Bass respectfully requests the Court grant his Motion to Suppress, suppress the material obtained during the execution of the January Search Warrant and June Search Warrant, and disqualify the FBI agents who knowingly (or, at the very least, recklessly) used these materials in their post-indictment, post-seizure investigation.

**WINSTON & STRAWN LLP**
*/s/ Thomas M. Melsheimer*

Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
Scott C. Thomas
Texas Bar No. 24046964
scthomas@winston.com
Dylan J. French
dfrench@winston.com
Texas Bar No. 24116393
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

*Counsel for Mouzon Bass, III*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on August 13, 2025.

*/s/ Thomas M. Melsheimer*
Thomas M. Melsheimer

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that, on August 13, 2025, I conferred with counsel for the government via email about the relief requested in this Motion. Counsel for the government is opposed to the requested relief.

*/s/ Scott C. Thomas*
Scott C. Thomas