# EXHIBIT 1

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

**FILED**

January 19, 2024

KAREN MITCHELL

CLERK, U.S. DISTRICT
COURT

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

15305 Dallas Parkway, Suite 800
Addison, Texas

)
)
)
)
)
)

Case No. 3:24-MJ- 39-RB

## APPLICATION FOR A SEARCH WARRANT

I, Jason D. Rennie, FBI, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ Northern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1349, 1343 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. 1349, 1347 | Conspiracy to Commit Healthcare Fraud |
| 18 U.S.C. 1956(h) | Conspiracy to Commit Money Laundering |

The application is based on these facts:

See attached Affidavit of Jason D. Rennie, FBI

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jason D. Rennie, FBI
*Printed name and title*

Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R. Crim. P. 41(d)(3).

Date: JANUARY 19, 324

*Judge's signature*

City and state: _____ Dallas, Texas _____

CLINTON E. AVERITTE, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 15305 Dallas Parkway, Suite 800, Addison, Texas 75001 | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jason D. Rennie, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search premises located within the Northern District of Texas known as 15305 Dallas Parkway, Suite 800, Addison, Texas 75001 ("**SUBJECT PREMISES**"), the business offices of Vivature, Inc., further described in Attachment A, for the things described in Attachment B.  As described below, Vivature and Vivature's owner Mouzon "Muzzy" Bass ("Bass"), Executive Vice President Lance Wilson ("Wilson"), contracted physician Dr. Robert Brent Scott ("Dr. Scott") have obtained, through false and fraudulent pretenses, over $70 million in paid reimbursements from health care companies such as Blue Cross Blue Shield ("BCBS") of Texas, BCBS of Arkansas, Cigna, Humana, as well as the United States Government.  On January 10, 2024, a United States Grand Jury sitting in the Eastern District of Texas returned a three-count indictment charging Bass, Wilson, and Scott with: (1) Conspiracy to Commit Wire Fraud

(18 U.S.C. § 1349, 1343); (2) Conspiracy to Commit Healthcare Fraud (18 U.S.C. § 1349, 1347); and (3) Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h))

2.      I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since September 2004, and I am assigned to the Frisco Resident Agency, Dallas Division, located at 2801 Network Boulevard, Suite 710, Frisco, Texas 75034. As a Special Agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. I am currently assigned to a squad that is responsible for investigating complex white-collar crimes. While in the FBI, I have participated in the investigation of individuals and organizations involved in various crimes, including, but not limited to, mail fraud, wire fraud, financial institution fraud, healthcare fraud, money laundering, kidnapping, bank robbery, and fraud against the government. I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations.

3.      The facts in this affidavit come from my personal observations, my training and experience, queries of records and databases, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      I make this affidavit in support of an application for a warrant to search the **SUBJECT PREMISES**. I request authority to search the entire **SUBJECT PREMISES**, including all rooms, attics, storage areas, safes, and outbuildings, and any computer or

2

computer storage media located therein.  The search also includes the search of vehicles registered to Bass, to the **SUBJECT PREMISES**, located at or near the **SUBJECT PREMISES**, which fall under the dominion and control of the person or persons associated with said **SUBJECT PREMISES**.  The search of these vehicles is to include all internal and external compartments and all containers that may be associated with the storage of materials containing evidence of fraud or money laundering within the aforementioned vehicles.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause established that violations of the following statutes have been committed by Mouzon Bass, III aka Muzzy Bass and other individuals, known and unknown:  18 United States Code ("USC") §§ 1343 – Wire Fraud, 18 USC §§ 1347 – Healthcare Fraud, 18 USC §§ 1349 – Conspiracy to Commit Wire Fraud/Healthcare Fraud, and 18 USC §§ 1956 (h) – Conspiracy to Commit Money Laundering.  I also submit that there is probable cause to search the premise described in Attachment A for evidence, contraband, fruits, and instrumentalities of these crimes, as described in Attachment B.

## PROBABLE CAUSE

### *Summary of the Investigation*

6.    The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of a company called Vivature and certain executives and individuals connected to the company.  The investigation to date has revealed an extensive and ongoing healthcare fraud scheme involving losses of at least $70 million.  On January 10, 2024, a United States Grand Jury sitting in the Eastern District of Texas

3

returned a three-count indictment charging Vivature's president and CEO Mouzon Bass, III aka "Muzzy," Vivature's executive Vice President Lance Wilson, and a contracted physician, Robert Scott, (collectively, "defendants") with: (1) Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349, 1343); (2) Conspiracy to Commit Healthcare Fraud (18 U.S.C. § 1349, 1347); and (3) Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)). Through this warrant, I now seek authority to search the business premises of Vivature, which has been listed on its website, contracts, bank records, and various other evidence collected in the investigation.

7.     In essence, the investigation to date has shown that Bass, Wilson, and Scott operated a two-fold scheme.  In the first part, Bass and Wilson used their company, Vivature, to submit false claims to private insurance carriers representing that physicians, like co-conspirator Robert Scott, were providing medical services for injured student-athletes at universities across the country.  In reality, Scott and other physicians did not see or treat these student-athletes, and in many instances, were physically hundreds of miles away from where the student-athletes were receiving treatment.  The services were actually performed by athletic trainers employed by the educational institutions' athletic departments—who, most times, were specifically excluded from insurance companies' reimbursement policies.

8.     The second part of the scheme involved the defendants' efforts to fraudulently obtain Health Resources and Services Administration ("HRSA") government funds earmarked for COVID-19 testing provided to uninsured Americans. The defendants partnered with international resorts hosting American travelers abroad, offering to manage

4

the billing and claims process for COVID-19 testing provided to these American travelers. Then, the defendants submitted thousands of reimbursement claims to HRSA for such travelers. In submitting these claims, the defendants represented to the government that: (1) the travelers were uninsured; and (2) the testing took place at the medical offices of Scott's company Varsity Health, located in the United States. In reality, these travelers actually had private insurance, and Scott did not see these patients—effectively disqualifying the travelers from the HRSA program.

9.    Financial records and analysis show that using the fraudulently obtained proceeds, Bass and Wilson paid Scott for his participation in the scheme, paid themselves salaries and commissions, and purchased high-dollar luxury items and multi-million-dollar real estate. In total, the defendants fraudulently obtained over $50 million from private insurance carriers, and over $20 million from the HRSA program.

## Relevant Entities and Connection to SUBJECT PREMISES

### *Vivature*

10.    Vivature is a company that purports to provide medical billing services to a variety of entities, including universities and high schools. On April 13, 2012, a Certificate of Formation was filed with the Texas Secretary of State for Vivature. The most current Public Information Report filed with the Texas Secretary of State indicates that the company is located at the **SUBJECT PREMISES**. Vivature's website currently lists a single address in its "Contact Us" page, the **SUBJECT PREMISES**. The website also lists Bass as the Chief Executive Officer and Wilson as the Executive Vice President.

5

11.     Based on my review of the business records for Vivature, from approximately January 1, 2014, through December 10, 2021, Vivature's headquarters was located at 5050 Spring Valley Road, Dallas, Texas 75240 ("**PRIOR SUBJECT PREMISES**"). On or about December 11, 2021, Vivature's headquarters moved from the **PRIOR SUBJECT PREMISES** to 15305 Dallas Parkway, Suite 800, Addison, Texas 75001 ("**SUBJECT PREMISES**"). Based on my training and experience, when corporate moves occur, all business-related materials, documentation and computers are moved from the **PRIOR SUBJECT PREMISES** to the **SUBJECT PREMISES**. The investigation to date indicates that Vivature's move took place on December 11, 2021, and December 12, 2021, and Vivature was open for business at the **SUBJECT PREMISES** on December 13, 2021. Vivature's business has continued, without interruption, since this time.

### *Orchestrate HR*

12.     Orchestrate HR is Vivature's parent company and purports to offer services relating to human resource technology, human resource consulting, and employee benefits consulting. According to its website, Orchestrate HR has been in business for 50 years and currently serves over 5,000 clients with 400 corporate employees and offices in 13 different states. Business records obtained in the investigation show that Orchestrate HR is the umbrella company for Vivature, Inc., and is wholly owned and controlled by Bass and is also headquartered at the **SUBJECT PREMISES**.

### *Varsity Health*

13.     On August 7, 2017, a Certificate of Incorporation was filed with the Oklahoma Secretary of State for "Robert B. Scott, D.O, P.C." Dr. Scott was listed as the

6

Registered Agent for this company. On August 16, 2021, Robert B. Scott, P.C., doing business as "Varsity Health" was granted National Provider Identifier (NPI) number XXXXXX6432. On December 17, 2021, the NPI registry was updated and listed Bass as the Authorized Official and "Administrator/Agent" at telephone number 972-367-4845, which is the telephone number for Vivature at the **SUBJECT PREMISES**. Further, the mailing address provided for the Varsity Health NPI application was that of the **SUBJECT PREMISES**.

### The Athletic Billing Scheme

14.    As described above, the investigation has shown, through business records, healthcare claims data, witness interviews, and financial analysis, that part of the defendants' scheme was to partner with universities across the nation and submit insurance claims to private insurance carriers (*e.g.*, Blue Cross Blue Shield ("BCBS") of Texas, BCBS of Arkansas, Kaiser Permanente, Cigna, and Humana) for medical services provided to injured student-athletes. Specifically, Vivature, at the direction of Bass and Wilson, represented that when a student-athlete was injured in relation to a university sport, the institution's athletic trainer could record the work they performed for the injury in the athletic training room within Vivature's electronic medical record software. Vivature would then use the information in its software, along with student demographics, insurance data, and other notes related to the injury for claims submission to the insurance company. Vivature would then electronically submit the claim to the insurance company for billing. Insurance companies would then, after evaluating the submission, pay the claim directly to Vivature, for the benefit of the institution. Vivature would then  share the revenue with

7

institution per the parties' contract. In reality, Vivature submitted claims falsely representing that physicians, like Robert Scott, were performing the services actually performed by athletic trainers employed by the educational institutions' athletic departments, and who were, most times, specifically excluded from insurance companies' reimbursement policies. Vivature submitted these claims to the insurance companies, named physicians like Scott as the servicing provider, and used the physicians' National Provider Identifier (NPI) on the claims paperwork. In the course of submitting these claims, the defendants caused wire transmissions that affected interstate commerce.

### *Exemplar Contracts and Connection to Vivature's Business Location*

15.     Over the course of the scheme, Vivature representatives executed contracts with multiple educational institutions. For instance, on December 3, 2018, Wilson, on behalf of Vivature, signed a contract with Arkansas Tech University ("ATU") to provide web-based medical billing services, insurance verification, and credentialing services. According to the contract, Vivature agreed to pay ATU 65% of the total insurance collections received for claims billed for ATU student-athletes. The Vivature address included on the contract paperwork was the **PRIOR SUBJECT PREMISES**.

16.     Over the course of the scheme, records and witness interviews indicate that Bass and Wilson agreed to pay certain physicians for the use of the physician's NPI and credentials on the claims paperwork. For example, in or around August 2017, Bass, on behalf of Vivature, entered into an agreement with Scott, under which Scott was to "provide medical oversight of athletic trainers and related personnel who provide treatment on or for the benefit of Vivature Clients." In exchange for Scott's services, Bass and

8

Vivature agreed to pay Scott $10,000 per month.  Bass was a party to the contract with an address listed as the **PRIOR SUBJECT PREMISES**.

### *Fraudulent Claims and Ties to Vivature's Business Location*

17.     Claims data obtained from BCBS show that between in or around August 2020 and May 2023, Vivature submitted thousands of claims to BCBS Arkansas on behalf of Arkansas Tech University ("ATU") for treatment provided to injured student-athletes.

18.     In a 2023 interview with law enforcement agents, ATU's Head Athletic Trainer with initials "B.W" confirmed that Scott was assigned to ATU by Vivature and was supposed to electronically review treatments rendered by ATU athletic trainers. However, B.W. confirmed that Scott never physically treated any ATU athletes, never came to ATU's campus, and never spoke with B.W.

19.     Yet Scott was listed as the "servicing provider" on over $230,000 worth of claims submitted to BCBS Arkansas on behalf of ATU.  Specifically, between 2020 and 2023, Vivature submitted claims to BCBS Arkansas which listed Dr. Scott as the servicing provider, ATU via NPI XXXX6428 as the billing provider, and Vivature's address, both at the **PRIOR SUBJECT PREMISES** and the **SUBJECT PREMISES**, as the billing address. Ultimately, BCBS of Arkansas paid Vivature approximately $12,916 for these claims.

20.     The records obtained to date indicate that Vivature, at the direction of Bass and Wilson, submitted thousands of similar claims to private insurance carriers.  The scheme extended to other physicians and universities around the country.  A conservative

9

financial analysis of these claims and payouts shows that the defendants fraudulently obtained at least $50 million as part of this particular billing scheme.

21.    On April 19, 2021, an employee with initials P.A. with Vivature's parent company, Orchestrate HR, sent an email to Titan Bank titled "New Account – Robert B Scott DO PC." In the email, P.A. stated "We have a relationship with Dr. Robert Scott. He is our consulting doctor when colleges need a doctor to supervise their athletic training rooms and student health clinics. Vivature does the medical billing for those schools and shares the revenue (insurance claims proceeds) with the schools. We pay Dr. Scott and maintain his accounting records, do his taxes, corporate paperwork, etc." The email went on to request the opening of a new bank account in the name of "Dr. Robert B. Scott, D.O. P.C., dba Varsity Health." The phone number contained on P.A.'s signature line is the phone number for the **SUBJECT PREMISES**.

22.    Over the course of the investigation, the FBI also obtained financial records from Veritex Bank regarding financial accounts related to Bass, Wilson, Vivature and Dr. Scott. The records provided by Veritex Bank detailed that on August 30, 2017, Veritex Bank account number XXXX9062 was opened in the name of Robert B. Scott, D.O. P.C. with a mailing address of the **PRIOR SUBJECT PREMISES**. In addition, this account received routine payments from a different Vivature account at Veritext Bank, bearing account number XXXXXX1200, which totaled over $1 million between 2018 and 2023. In addition, based on an interview with Scott himself, on or about August 7, 2023, Scott traveled to Dallas, Texas, and visited the Vivature office location at the **SUBJECT**

10

**PREMISES**.  The purpose of the visit was to request from Vivature a "complete and accurate list of the schools" Dr. Scott was involved with.

## COVID-19 Billing Scheme

### *Testing and HRSA Reimbursements*

23.    Between January 2021, and June 2022, the United States instituted a federal order that all air passengers arriving from a foreign country to the United States provide proof of a negative COVID-19 test or documentation of having recovered from COVID-19.  The order applied to all travelers regardless of citizenship or originating location.  To encourage Americans to travel abroad during the pandemic, many hotels and resorts began offering COVID-19 testing to American travelers returning home.

24.    Since 1982, the Health Resources and Services Administration ("HRSA") has been a taxpayer-funded federal program dedicated to providing equitable healthcare to the nation's highest-need communities serving people who are geographically isolated and economically or medically vulnerable.  HRSA programs support people with low incomes, people with HIV, pregnant people, children, parents, rural communities, transplant patients, and other communities in need, as well as the health workforce, health systems, and facilities that care for them.  Through HRSA, the U.S. Department of Health and Human Services provided claims reimbursement to healthcare providers for testing uninsured individuals for COVID-19, treating uninsured individuals with a COVID-19 diagnosis, and administering COVID-19 vaccines to uninsured individuals.  The program did not cover or apply to insured individuals, nor did it cover COVID-19-related services administered outside the country.

11

### *Fraudulent Billing of HRSA*

25.    As described above, beginning in 2021 and during the COVID-19 pandemic, Bass, Wilson, Scott, and others affiliated with Vivature executed a separate scheme to fraudulently obtain HRSA government funds earmarked for COVID-19 testing provided to uninsured Americans.  Documents and witness interviews show that the defendants partnered with international resorts hosting American travelers abroad, offering to manage the billing and claims process for COVID-19 testing provided to these American travelers. The defendants then submitted thousands of reimbursement claims to HRSA for such travelers.  In submitting these claims, the defendants represented to the government that: (1) the travelers were uninsured; and (2) the testing took place at the medical offices of Scott's company Varsity Health, located in the United States.  In reality, these travelers actually had private insurance, and Scott did not see these patients—effectively disqualifying the travelers from the HRSA program.  In addition to these American travelers, the defendants also submitted HRSA reimbursement claims for COVID-19 testing administered to insured students at high schools and universities contracted by Vivature.  Like the travelers, these insured students were ineligible for reimbursements under HRSA.

26.    The investigation has shown that in 2021 and 2022, many international resorts provided complimentary COVID-19 tests for their guests.  Vivature offered the resorts insurance billing and claims services for COVID-19 testing, and in turn, shared revenue received from reimbursement claims.  The FBI obtained an agreement Vivature executed with one international resort in the Caribbean regarding this arrangement.  For

US v Bass-00004384

instance, on or about August 25, 2021, Wilson, on behalf of Vivature, executed a COVID-19 billing contract with Grace Bay Resorts in the islands of the Turks and Caicos, to pay the resort 60% of the gross collections received, with Vivature retaining the remaining 40%. The Vivature address listed on the contract paperwork was the **PRIOR SUBJECT PREMISES**.

27.     Pursuant to the agreement, Vivature employee with initials F.J. emailed the resort, copying Bass, Wilson, and Scott, stating: "I am reaching out to you on behalf of Muzzy to inform you that our Medical Director, Dr. Scott will be visiting the Grace Bay Resort on Thursday, November 11th to see the COVID testing operations and meet their team. Dr. Scott will also be visiting other companies in Turks and Caicos who are currently working with us and have a contract with our company for a brief introduction & talk more about our services related to COVID [.]"

### *Example Fraudulent Claims*

28.     In or around October 2021, an individual with initials D.D. and his spouse C.D. visited the Shore Club Hotel, believed to be a Vivature-contracted resort, in the islands of Turks and Caicos. At the time, C.D. and D.D. were both insured by BCBS Texas. Shortly before leaving the resort, on or about November 13, 2021, hotel staff administered complimentary COVID-19 tests so that C.D. and D.D. could provide documentation upon their return to the U.S.

29.     In an October 2023 interview with law enforcement agents, D.D. confirmed the following regarding D.D. and C.D.'s visit to the Shore Club Hotel: (1) although both C.D. and D.D. were insured by BCBS Texas at the time of the visit, the hotel never

13

requested or obtained their insurance information; (2) the COVID-19 tests were complimentary for guests; (3) C.D. and D.D. never met or interacted with an individual or physician named Scott; and (4) C.D. and D.D. were never advised that their COVID-19 tests would be billed to the United States government or their private insurance.

30.    Despite these facts, in or around December 2021, Vivature submitted reimbursement claims for C.D. and D.D.'s COVID-19 tests. For C.D., Vivature submitted a claim to HRSA, which listed Scott or Scott's entity Varsity Health (with business and billing address as **SUBJECT PREMISES**) as the servicing provider, which included Scott's NPI and noted a place of service as a medical facility within the United States. Meanwhile, Vivature submitted a separate claim for D.D. to BCBS Texas, which also listed Scott as the servicing provider.    Based on these representations, HRSA reimbursed Vivature $74.29 and BCBS Texas reimbursed Vivature approximately $41.38.    These payments were deposited in accounts owned and controlled by Bass.

31.    Financial records and analysis show that for Scott's assistance in the scheme, Bass, Wilson, and Vivature agreed to pay Scott 1% of net collections, and ultimately paid Scott at least $500,000 for his role in this scheme. In exchange for the international resorts' cooperation in Vivature's scheme, Bass and others sent over $6.9 million to these resorts per their contracts. A summary analysis of the records obtained to date shows that the defendants submitted several thousand individuals claims to HRSA and fraudulently obtained over $20 million in government funds.

14

*Financial Accounts and Connection to SUBJECT PREMISES*

32.     As part of the investigation, FBI obtained numerous financial records from various institutions, including Veritex Bank and Titan Bank for the Bass, Wilson, Vivature, and Scott. The records provided by Titan Bank detailed the following bank accounts which were under the control of Bass, all of which have with the **SUBJECT PREMISES** as the mailing address.

| Account Number | Account Name | Account Nickname | Mailing Address |
|---|---|---|---|
| XXX3746 | Orchestrate HR, Inc. | Orchestrate HR | **SUBJECT PREMISES** |
| XXX6485 | Eben Concepts, Co. | Eben Concepts | **SUBJECT PREMISES** |
| XXX0970 | Eben Concepts, Co. | Eben Concepts | **SUBJECT PREMISES** |
| XXX2111 | Vivature, Inc. | Vivature Main Acct. | **SUBJECT PREMISES** |
| XXX8036 | Vivature, Inc. | Varsity Health | **SUBJECT PREMISES** |

33.     On March 25, 2022, Bass executed a "Re-Certification of Beneficial Ownership of Legal Entity Customer" in which Bass attested that he maintains ownership of Vivature, Employer's Direct Administrative Solutions, Inc., Vologic, Inc., Employer's Direct Health, Inc., and Orchestrate HR, Inc. Within the documentation was a listing of all Titan Bank account names/numbers which were managed by Orchestrate HR, to include the aforementioned bank accounts. In addition to these accounts, there were approximately 226 separate Vivature accounts which were opened in the names of specific colleges, universities to be used and maintained to manage the monies received from insurance

15

US v Bass-00004387

companies to include BCBS of Texas, Cigna, Humana and the United States Government. All of these accounts share the same mailing address as the **SUBJECT PREMISES**. The attestation was executed by Bass, via Docusign, utilizing IP address 98.6.249.190.

34.     On October 16, 2023, the FBI conducted an open-source review of Whois internet protocol ownership records for IP address 98.6.249.190. The search revealed that IP address 98.6.249.190 was controlled by Employer's Direct Health at the **SUBJECT PREMISES**.

### CURRENT ACTIVITY AT SUBJECT PREMISES

35.     On October 16, 2023, the FBI conducted surveillance on the **SUBJECT PREMISES**. Located within the lobby of the building which the **SUBJECT PREMISES** is physically located within is a kiosk which is utilized to find businesses within the building. Agents scrolled to the business name Vivature and the kiosk indicated the business was located in Suite 800, which is identical to the **SUBJECT PREMISES**. Upon arrival on the 8th floor, suite 800 was marked with a sign which read "Risk Strategies." Visible through the glass was a television which displayed "eBen Employee Benefits." According to the eBen Employee Benefits website, Bass is a Managing Director of eBen Employee Benefits which appears to be co-located with Vivature within the **SUBJECT PREMISES**.

36.     On October 17, 2023, the FBI reviewed the website for Vivature, bearing web address of www.vivature.com. A review of the website details a physical address of the **SUBJECT PREMISES**.

16

US v Bass-00004388

37.    Through my training and experience, and due to the portability of electronic devices, it is reasonable to believe that Bass and other co-conspirators have transported electronic devices (laptops, cellular telephones, etc.) to and from Vivature, the **SUBJECT PREMISES**.  Moreover, because the investigation has shown that the several acts in furtherance of the fraud were executed using electronic devices, including (1) the digital submission of claims and claim related documentation via a computer and (2) the communication and coordination between co-conspirators via phone and email, it is likely that evidence, fruits, instrumentalities of the crime may be found on those electronic devices at the **SUBJECT PREMISES**—the same address tied to the submission of fraudulent health care claims.  Moreover, based on my training and experience investigating white collar crimes, staleness issues are mitigated by the fact the electronic documents and records likely still exist in their original form.

## TECHNICAL TERMS

38.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and

17

international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.    *Probable cause.* I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

18

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and print documents used in the fraudulent obtainment of PPP loans and money laundering scheme. There is reason to believe that there is a computer system currently located on the **SUBJECT PREMISES**.

41.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

19

US v Bass-00004391

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

20

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

42.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

21

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

22

## CONCLUSION

44.    I submit that this affidavit supports probable cause for a warrant to search the

**SUBJECT PREMISES** described in Attachment A and seize the items described in

Attachment B.

Respectfully submitted,

Jason D. Rennie
Special Agent
Federal Bureau of Investigation

Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R.
Crim. P. 41(d)(3).

Subscribed and sworn to before me on January 19 , 2024:

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

23

US v Bass-00004395

## ATTACHMENT A

*Property to be searched*

The property to be searched 15305 Dallas Parkway, Suite 800, Addison, Texas 75001, a commercial office space which is located within a sixteen-story mid-rise office building name Colonnade III.  The exterior of the building is comprised of gray stone and glass with "Zurich" prominently displayed at the top of the building.



US v Bass-00004396



Suite 800 is located on the (corner) of 8th floor of the building.  The suite number is prominently displayed on the right side of the door alongside a sign which reads "Risk Strategies."

2

US v Bass-00004397

## ATTACHMENT B

### *Property to be seized*

1.      All records relating to violations of 18 U.S.C. § 1343 (Conspiracy to Commit Wire Fraud), those violations involving Mouzon "Muzzy" Bass or co-conspirators and occurring after January 1, 2014, including:

      a. Records and information relating to a conspiracy to defraud the healthcare firms.

      b. Records and information relating to bank accounts, tax documents, business records, communications with co-conspirators, etc.

2.      Computers or storage media used as a means to commit the violations described above.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

      c. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

      d. evidence of the times the COMPUTER was used;

US v Bass-00004398

    e.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    f.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    g.   records of or information about Internet Protocol addresses used by the COMPUTER;

    h.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    i.   contextual information necessary to understand the evidence described in this attachment.

4.    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

US v Bass-00004399

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

US v Bass-00004400